U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 APR 29  AM 10: 46

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 5:13-cr-42 |
| | ) | |
| VON SIMMONDS | ) | |

**OPINION AND ORDER DENYING DEFENDANT'S MOTION
TO SUPPRESS EVIDENCE BASED ON AN UNLAWFUL SEARCH AND
MOTION TO SUPPRESS RECENTLY PRODUCED EVIDENCE THAT IS THE
FRUIT OF AN UNLAWFUL CELLPHONE SEARCH**
(Docs. 30, 32)

This matter comes before the court on Defendant Von Simmonds's Motion to Suppress Evidence Based on an Unlawful Search and Motion to Suppress Recently Produced Evidence that is the Fruit of an Unlawful Cellphone Search. (Docs. 30, 32.) In his motions, Defendant argues that incriminating evidence against him was derived from a nonconsensual search of Kenneth Clark's apartment where he was an overnight guest.[1] In the alternative, if the search of Mr. Clark's apartment is deemed lawful, Defendant argues that the search of his cell phone was not incident to his arrest and that the alleged unlawful cell phone search tainted a subsequent search warrant application.

The government opposes Defendant's motions to suppress, asserting that the search of the apartment was preceded by verbal and written consent voluntarily given by Mr. Clark -- the apartment's tenant. The government further contends that Defendant's motion to suppress evidence from his cell phone is moot because the government does not intend to use evidence derived from the initial cell phone search at trial. Defendant counters the issue is not moot because, although the government did not use the

---

[1] The government "assum[es] *arguendo* that [D]efendant can prove his standing." (Doc. 33 at 5); *see also United States v. Osorio*, 949 F.2d 38, 41 (2d Cir. 1991) ("[A]n overnight guest has a legitimate expectation of privacy in his host's home.") (internal quotation marks omitted).

information derived from a search of his cell phone to obtain a search warrant, the government would not have obtained the search warrant absent the allegedly illegal search. He argues that the government cannot "cure" an illegal search in this manner.

The government is represented by Assistant U.S. Attorney Craig S. Nolan. Defendant is represented by Assistant Federal Public Defender Steven L. Barth.

Defendant is charged in a one count Indictment with knowingly and willfully conspiring with others to distribute a mixture and substance containing a detectable amount of cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(C).

## I.    Findings of Fact.

The court has previously addressed many of the operative facts in its Opinion and Order Denying Defendant's Motion to Suppress Evidence dated November 25, 2013. (Doc. 26.) Post-hearing, the court granted in part Defendant's motion to re-open the suppression hearing and permitted both parties to submit supplemental declarations regarding the use of the hallway which led to Mr. Clark's apartment. The parties completed these filings on April 25, 2014. Defendant submitted the declarations of Defendant, Daniel Gagne (the apartment's owner and landlord), and Kevin Ridgley (Defense counsel's investigator). The government submitted a declaration from Mr. Clark.

Based upon the admissible evidence, the court makes the following findings of fact. On the evening of March 7, 2013, at approximately 12:30 p.m., Rutland Police Department Detective David LaChance, FBI Agent Christopher Destito, and several other law enforcement agents approached the apartment of Kenneth Clark with the intent of performing a "knock and talk." The agents decided to approach Mr. Clark based upon information from a cooperating source that someone named "Ken" was distributing a large quantity of heroin out of his apartment located at 29 Church Street in Rutland, Vermont. Mr. Clark was a non-paying tenant in the apartment after a former girlfriend left both it and him. He resided there with his current girlfriend and his young son.

In order to access Mr. Clark's apartment, the officers opened an unlocked street level door and travelled through a hallway which led up a staircase to the front door of

2

Mr. Clark's apartment. There is no doorbell or knocker for the outside street level door and it can be locked by the tenant. The parties dispute the frequency of how often the outside street level door was locked. Mr. Clark avers that he locked it only approximately 30% of the time and that his landlord also had a key. He contends that deliveries were frequently made to his apartment by people who used the hallway to access the front door of his apartment and that friends and members of the public would enter through the outside door and proceed upstairs to the front door of his apartment to visit him. He avers that Detective LaChance used the hallway to access the front door of Mr. Clark's apartment on a prior occasion. Mr. Clark states that he did not try to exclude others from the hallway, and that he did not consider the outside door to be his front door because, among other things, the hallway also led to the apartment building's garage and basement which his landlord used.

In contrast, Mr. Clark's landlord, Daniel Gagne, avers that there is only one key to the outside door and that he had given it to the prior tenant with whom Mr. Clark had lived. He avers that the tenant in Mr. Clark's apartment is required to pay for the electricity to the hallway and the stairwell lights. In Mr. Gagne's experience, Mr. Clark kept the outside door locked and so he would call Mr. Clark to unlock the outside door when he needed to access the basement of the building from the hallway. Although Mr. Gagne allowed the former tenant to store some of her possessions in a storage room located off the hallway, he told Mr. Clark to remove a fish tank and other belongings in the hallway because they constituted a fire hazard. Mr. Gagne was uncertain regarding the proper classification of the hallway, but he did not consider it a "common area." (Doc. 59-1 at 1.) He notes that at the top of the stairs in the hallway "there is another door, leading to the living area of Apartment 3 [which is the apartment in question]." *Id.*

Detective LaChance knocked on the door to the apartment and Mr. Clark responded, "come in." (Tr. 1/21/14 at 16:18.) After approximately ten to fifteen seconds, Detective LaChance knocked again and shouted "Rutland City Police." *Id.* at 16:19-20. Although Detective LaChance asked Mr. Clark to open the door, Mr. Clark

does not recall him making this request and credibly testified that he went to the door and opened it "voluntarily." *Id.* at 38:16-19.

Detective LaChance introduced himself to Mr. Clark with whom he had prior contact. At the time, Detective LaChance was dressed in a police uniform. He also introduced Agent Destito who was dressed in plain clothes. Mr. Clark recalls that he stepped out into the hallway, closing the apartment door behind him. The agents asked him if his name was "Kenneth Clark" and Mr. Clark answered in the affirmative. The agents told him that they suspected drug activity inside the apartment. Thereafter, Mr. Clark's son, who was just under two years old, opened the door behind him. Mr. Clark stepped back inside the threshold of the apartment and moved his son back inside the apartment. Neither Detective LaChance nor Agent Destito recalls Mr. Clark stepping outside the apartment.

The agents asked if there were any drugs in the home. Mr. Clark replied that he had a rock of crack in the apartment on a table in his living room and told the agents they could seize it. Mr. Clark initially testified that he told the agents they could not come into his apartment but "[b]y telling them I had rock in my house I believe [that] was their consent." *Id.* at 40:23-24. Both Agent Destito and Detective LaChance credibly testified that they asked Mr. Clark if they could enter the apartment and he agreed that they could do so. Mr. Clark later conceded in his testimony that he consented to their entry.

According to Mr. Clark, the agents remained in the hallway and he remembers "them asking for consent. And they mentioned the card." *Id.* at 30:24-25. Mr. Clark believes that it was Detective LaChance who presented him with a small card at the entrance to his apartment. Mr. Clark initially testified that AUSA Nolan told him that he signed a consent form against a wall above his head. He later retracted this statement and stated that his girlfriend told him that the agents presented him with a card on the night in question, which he signed against a wall. The signature on the consent form does not resemble Mr. Clark's signature and he does not recall signing it.

Detective LaChance credibly testified that he received verbal consent from Mr. Clark for the search outside the apartment door and written consent when he entered Mr.

4

Clark's kitchen before the search took place. He recalls Mr. Clark holding his son in the kitchen and that both he and Mr. Clark were standing when the form was signed. He further recalls Mr. Clark's kitchen was too cluttered to provide a suitable surface for signing the consent form. The court finds that Mr. Clark did in fact sign the consent form and that his signature was altered by the circumstances in which it was signed.

Detective LaChance witnessed Mr. Clark's signature on 3-8-13 at 0036 hours on a consent form that states as follows:

> I freely give my permission to Police Officer 'Detective LaChance' of the Rutland City Police to conduct a complete search of . . . 'My apartment 29 Church St. Apt 3' and its contents here under my control. I understand I do not have to allow this. No threats or promises have forced this consent.

(Gov. Ex. 1.)

On the consent form, Detective LaChance wrote in his name, circled the word "Residence" and wrote in "Apartment 3" based upon information provided by Mr. Clark. Detective LaChance also recorded the date and time. He did not read the consent form to Mr. Clark verbatim. Mr. Clark did not ask any questions about the form.

Mr. Clark described his memory of the events in question as "[g]ood enough" (Tr. 1/21/14 at 15:9), but also conceded his memory was "hazy," *id.* at 37:22-24, and stated: "I'm a little foggy on my memory." *Id.* at 33:15. Although he does not recall all aspects of the encounter because it occurred ten months prior to the court's evidentiary hearing, he admits that he may have been under the influence of crack cocaine at the time. Detective LaChance credibly described Mr. Clark as "very calm," cooperative, and able to answer the agents' questions. *Id.* at 69:12-23. He acknowledged that Mr. Clark admitted that he had used crack cocaine that day, although he did not specify the time period in which this took place. Agent Destito, who was standing close to Mr. Clark, credibly described Mr. Clark as coherent and noted that he did not appear drunk. Agent Destito could not tell whether Mr. Clark was under the influence of narcotics, although his speech was not slurred and his eyes were not glassy.

At some point, there was a loud bang and the agents asked who else was in the apartment. Mr. Clark responded that there were three individuals and a child. The agents

proceeded in the direction of the back bedroom from which the noise appeared to have emanated. According to Mr. Clark, after a time period "greater than 10 minutes" but "less than an hour," *id.* at 29:4-8, the agents emerged from the back bedroom with Defendant. The back bedroom contained a crib where Mr. Clark's son slept and was the room occupied by Mr. Clark and his girlfriend. Defendant did not have permission to be in Mr. Clark's bedroom on the night in question.

Thereafter, Mr. Clark fell asleep on a couch. He does not recall the agents speaking to Defendant or the agents leaving his apartment with Defendant. In the course of the search, Mr. Clark did not raise any objections. He credibly testified that he was neither threatened by the agents, nor felt threatened by their presence during the encounter.

The agents' search of Mr. Clark's apartment ended at approximately 2:00 a.m. on March 8, 2013. In the course of the search, a cell phone was found on the bed on which Defendant was lying when the agents entered the back bedroom. Currency in the amount of $4,503 and an approximately three gram rock of suspected crack cocaine were also found in the back bedroom.

Agent Destito took custody of Defendant's cell phone from Detective LaChance prior to leaving Mr. Clark's apartment and transporting Defendant to Burlington, Vermont. FBI Special Agent Ryan Reidel searched the cell phone using a system to download cellular telephones. The cell phone was downloaded for the first time on March 25, 2013, approximately eighteen days after Defendant's arrest. On January 10, 2014, Defendant moved to suppress all evidence derived from this warrantless cell phone search. On January 17, 2014, Agent Destito applied for a search warrant for the cell phone, which was granted the same day. The supporting affidavit does not reference the March 25, 2013 search or contain any evidence derived therefrom. Thereafter, the agents downloaded the cell phone again in the FBI's Burlington office. The government seeks to use evidence from this second search in its case-in-chief at trial.

## II.    Conclusions of Law and Analysis.

### A.    Whether Law Enforcement's Entry into the Hallway was Lawful.

"The Fourth Amendment protects legitimate expectations of privacy rather than simply places.  If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search' subject to the Warrant Clause." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).  "The expectation of privacy against warrantless [searches] thus has reference to a place, and will be violated only if the place is one that the defendant has the right to keep private and subject to his exclusive control." *United States v. Holland*, 755 F.2d 253, 255 (2d Cir. 1985).  "Accordingly, it is the established law of this Circuit that the common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors." *Id.* Moreover, the Second Circuit has "never have held that the common areas must be accessible to the public at large nor [has it] required a quantified amount of daily traffic through the area as a basis for determining that a common area is beyond an individual's protected zone of privacy." *Id.* at 256.  This rule "lays down a clearly-defined boundary line for constitutionally permissible police action, which is readily apparent to an officer in the field, without a need for counting apartments, analyzing common-hallway traffic patterns or interpreting the mental processes of a suspect relating to an area used in common with others." *Id.*

In this case, on the night in question, the outside door to the hallway which led to Mr. Clark's apartment was unlocked.  Mr. Clark credibly claims this was not atypical and that his friends and members of the public often accessed his apartment front door through the use of this hallway.  The court need not resolve whether Mr. Clark had the only key to the outside door, because Mr. Gagne, Mr. Clark's landlord, credibly avers that he used the hallway to access the basement to the building and directed Mr. Clark to open the outside door for this purpose.  He also *directed* Mr. Clark to remove his personal belongings from the hallway because they constituted a fire hazard, while he *permitted* the former tenant to use a storage room off the hallway to store her belongings.  The landlord notes that although he did not consider the hallway to be a "common area," it led

7

to both a garage and basement which he accessed and that "there is another door, leading to the *living area*" of Mr. Clark's apartment. (Doc. 59-1 at 1) (emphasis supplied).

The landlord's use and exercise of control over the hallway is inconsistent with Defendant's contention that the hallway was an extension of Mr. Clark's living quarters. Certainly, Mr. Clark does not make that claim, nor did he express any surprise or concern that, on the night in question, law enforcement had accessed his apartment's front door through the use of the hallway. As a result, even though the outside door was sometimes, or even frequently locked, the hallway was not in Mr. Clark's "protected zone of privacy," *id.* at 256, and law enforcement was not required to obtain his consent before entering the outside door and proceeding to Mr. Clark's apartment's front door for a "knock and talk." *See United States v. Acosta*, 965 F.2d 1248, 1252 (3d Cir. 1992) ("We find ourselves in agreement with the Second Circuit's analysis in *Holland* as applied to the facts here. It is undisputed that one of the officers turned the doorknob and found that the door was unlocked. Thus, the inner hallway was easily accessible to tenants, visitors, solicitors, workmen and other members of the public. On this record, defendants had no way to exclude anyone and, therefore, could not have reasonably expected their privacy to extend beyond their apartment door."); *see also United States v. Gray*, 283 F. App'x 871, 873 (2d Cir. 2008) (relying on *Holland* and finding the defendant "did not have a privacy interest in the hallway because it was not subject to his exclusive control").

## B.     Whether the Search of the Apartment was Consensual.

Defendant raises three challenges to Mr. Clark's alleged consent to search the apartment: (1) Mr. Clark did not have authority to consent to the search of the apartment; (2) Mr. Clark opened the apartment door in response to a command under color of authority rather than voluntarily; and (3) the government has not met its burden in establishing that Mr. Clark consented to the search of the apartment. None of these challenges has merit.

Defendant describes himself as an "overnight guest of Mr. Clark's" (Doc. 30 at 4) and thereby implicitly acknowledges that Mr. Clark was a tenant of the apartment in question. No evidence was presented to the contrary. Instead, Mr. Clark credibly

8

testified that he lived in the apartment with his girlfriend and his young son. As a tenant, Mr. Clark had actual authority to consent to the search. *See Georgia v. Randolph*, 547 U.S. 103, 120-21 (2006) (holding that a "co-tenant's consent to enter and search" is "constitutionally sufficien[t]" unless another tenant is physically present and expressly objects); *see also United States v. Matlock*, 415 U.S. 164, 171 (1974) (holding warrantless search is lawful when it is conducted pursuant to the voluntary consent of a person who has "common authority over or other sufficient relationship to the premises or effects sought to be inspected").

Defendant next argues that Mr. Clark's opening of the door was involuntary because he was merely complying with a command under the color of authority. "As commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion." *United States v. Cruz-Mendez,* 467 F.3d 1260, 1264 (10th Cir. 2006). However, a "'knock and talk' can become coercive if the police assert their authority, refuse to leave, or otherwise make the people inside feel they cannot refuse to open up." *United States v. Spotted Elk,* 548 F.3d 641, 655 (8th Cir. 2008). Courts have also held that "[o]pening the door to one's home is not voluntary if ordered to do so under color of authority." *United States v. Reeves*, 524 F.3d 1161, 1167 (10th Cir. 2008); *see also United States v. Poe*, 462 F.3d 997, 1000 (8th Cir. 2006) (opening door not consensual when one officer knocked persistently for "over ten minutes" and another "had commanded [the defendant] to open the door").

Here, Mr. Clark credibly testified that he did not open his door in response to a police command, but rather invited law enforcement to "come in" after the first knock and "voluntarily" opened the door in response to a second knock and an announcement that it was the Rutland Police who was knocking. Thereafter, Mr. Clark had the option of giving consent to the agents' entry into his home. He claims that he gave this consent by noting that he had crack cocaine in the apartment and by permitting the agents to thereafter enter his apartment and seize it. The government has presented credible evidence that Mr. Clark verbally and in writing consented to a search of the apartment

9

and raised no objections to the search thereafter.  The only remaining issue is whether Mr. Clark's consent to the search was voluntary.

"The core premise underlying the Fourth Amendment is that warrantless searches of a home are presumptively unreasonable." *United States v. Simmons*, 661 F.3d 151, 156 (2d Cir. 2011) (citing *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011)).  "Although warrantless searches of private property are generally presumed to be unreasonable, the law recognizes certain exceptions, for example, when the search is conducted pursuant to the consent of an authorized person." *United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006); *see also United States v. McGee*, 564 F.3d 136, 138 (2d Cir. 2009) ("A warrantless police search of a defendant's private premises which would otherwise violate the defendant's rights under the Fourth Amendment is lawful if conducted pursuant to the consent, voluntarily given, of another person who has authority to consent by reason of that person's common authority over or other sufficient relationship to the premises.") (internal quotation marks omitted); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (recognizing that "a search authorized by consent is wholly valid").

"The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker, as opposed to mere acquiescence in a show of authority." *United States v. Moreno*, 701 F.3d 64, 76 (2d Cir. 2012) (internal quotation marks omitted), *cert. denied*, 133 S. Ct. 2797 (2013).  "Voluntariness is a question of fact determined by a 'totality of all the circumstances.'" *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 227).  "'The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search.'" *Id.* (brackets omitted) (quoting *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995)).

"Although the Constitution does not require 'proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search,' such knowledge [is] highly relevant to the determination that there had been consent." *United States v. Mendenhall*, 446 U.S. 544, 558-59 (1980) (quoting *Schneckloth*, 412 U.S. at 234); *see also Garcia*, 56

F.3d at 422-23 (noting "knowledge of the right to refuse consent" is a "factor" in determining whether consent was voluntary).

In this case, Mr. Clark admitted he had a small amount of crack cocaine inside his apartment and allowed the agents to come inside the apartment in order to seize it. Thereafter, he provided both oral and written consent to a search of his apartment. The written consent form signed by Mr. Clark advised him of the right to refuse consent. Although Detective LaChance did not read the consent form to Mr. Clark verbatim, Mr. Clark clearly understood that the agents were "asking for consent. And they mentioned the card." (Tr. 1/21/14 at 30:24-25.) Mr. Clark acknowledges that he granted the agents' request to search his apartment and there is no evidence to support a conclusion that he was compelled to do so. These facts weigh heavily in favor of concluding that Mr. Clark's consent was voluntary. *See United States v. Puglisi*, 790 F.2d 240, 243-44 (2d Cir. 1986) (concluding consent voluntary, the court noted defendant consented only after he was informed he did not have to consent and signed two written consent forms); *United States v. Murphy*, 16 F. Supp. 2d 397, 401 (S.D.N.Y. 1998) (concluding consent voluntary when the "consent form, which [the defendant] read and which was explained to him before he signed it, gave clear notice of his rights").

To the extent that Mr. Clark was under the influence of crack cocaine at the time, he remained coherent, cooperative, and able to answer law enforcement's questions. *See United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006) (finding consent to search valid because, although the defendant "may have been under the influence of methamphetamine at the time of his arrest, . . . the evidence does not suggest that he was so intoxicated that he was not competent to understand the nature of his acts") (internal quotation marks omitted); *United States v. Koshnevis*, 979 F.2d 691, 694 (9th Cir. 1992) (rejecting the defendant's intoxication argument where agent testified that the defendant "appeared alert and cooperative").

The agents did not threaten Mr. Clark with physical force, handcuff him, tell him he would be arrested, or question him at length. Mr. Clark credibly testified that he did not feel threatened by the agents. During the course of the search, Mr. Clark never raised

any objection to the search or withdrew his consent.  Although the government presented no evidence regarding Mr. Clark's age, intelligence, or experience with the criminal justice system, he remained calm throughout his encounter with the agents and went to sleep on a couch during the course of the search notwithstanding a substantial police presence in his home.

Based upon the totality of the circumstances, the government has established by a preponderance of the evidence that Mr. Clark's consent to the search of his apartment was "the product of an essentially free and unconstrained choice by its maker, as opposed to mere acquiescence in a show of authority." *Moreno*, 701 F.3d at 76 (internal quotation marks omitted).  The government has also established that the agents had a "'reasonable basis for believing that there had been consent to the search.'" *Isiofia*, 370 F.3d at 231 (quoting *Garcia*, 56 F.3d at 423).  Defendant's Motion to Suppress Evidence Based on an Unlawful Search (Doc. 30) is hereby DENIED.

### C.   Whether the Seizure of Defendant's Cell Phone was Lawful.

Defendant argues that the seizure of his cell phone was unlawful because it took place without his consent and was not within the scope of Mr. Clark's consent.  The government counters that Defendant's cell phone was in plain view when it was seized in an area subject to a consensual search.

Under the plain view exception to the Fourth Amendment's warrant requirement, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *see also United States v. Gamble*, 388 F.3d 74, 76 (2d Cir. 2004) ("The plain view exception authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity.") (internal quotation marks omitted).  The plain view exception requires that law enforcement have "probable cause" to believe that the item in plain view is connected with criminal activity. *Arizona v. Hicks*, 480 U.S. 321, 326, 328 (1987).

In this case, the agents were lawfully present in Mr. Clark's apartment because they had previously obtained Mr. Clark's consent to enter and search it. Defendant's cell phone was discovered in plain view on the bed where he had been lying when the agents entered the back bedroom. The agents had probable cause to believe that the cell phone was connected with criminal activity because it was located in close proximity to $4,503 in U.S. currency and an approximately three gram rock of crack cocaine. Cell phones are generally recognized as tools of the illegal drug dealing trade. *See United States v. Hammett*, 2014 WL 642501, at *1-2 (2d Cir. Feb. 20, 2014) (summary order) (holding that cell phones are "tools that drug dealers often possess" and upholding seizure of two cell phones under plain view exception when discovered in an open bag containing a digital scale); *United States v. Portalla*, 496 F.3d 23, 27 (1st Cir. 2007) (recognizing that "cell phones . . . [are] essential tools of the[] drug trade"); *United States v. Slater*, 971 F.2d 626, 637 (10th Cir. 1992) (stating that a cell phone is a "recognized tool of the trade in drug dealing"). The government has therefore established that Defendant's cell phone was lawfully seized under the plain view exception to the warrant requirement.

### D.    Whether the Initial Search of Defendant's Cell Phone was a Lawful Search Incident to Defendant's Arrest.

Defendant contends that the warrantless search of his cell phone, approximately eighteen days after his arrest, violated the Fourth Amendment because it was not incident to his arrest. Under the search incident to arrest exception to the warrant requirement, law enforcement may conduct a warrantless search of a lawfully arrested person, his belongings, and the area within his control. *United States v. Robinson*, 414 U.S. 218, 224 (1973). The exception extends to "any container[]," defined as "any object capable of holding another object," including "luggage, boxes, bags, clothing, and the like." *New York v. Belton*, 453 U.S. 454, 460 & n. 4 (1981), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009).

A search incident to arrest must be "substantially contemporaneous with the arrest." *Shipley v. California*, 395 U.S. 818, 819 (1969) (per curiam) (internal quotation marks omitted). For this reason, courts have excluded evidence where the search of an

13

item seized incident to arrest did not take place in close temporal proximity to the arrest. *See, e.g., United States v. Torres-Castro*, 470 F.3d 992, 998 (10th Cir. 2006) (noting that "courts have found that a search may be incident to an arrest in cases where the search and arrest were separated by times ranging from five to sixty minutes"); *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003) (finding vehicle search not incident to arrest where driver was arrested, vehicle was driven to station, and search ensued); *Holmes v. Kucynda*, 321 F.3d 1069, 1082 (11th Cir. 2003) (holding post-arrest search of the defendant's purse not incident to arrest as the defendant was already arrested and detained at that time); *United States v. DiMarco*, 2013 WL 444764, at *10 (S.D.N.Y. Feb. 5, 2013) ("[A]lmost all of the courts of authority that have upheld the search of a cell phone under the search incident to arrest exception, contemplated searches that occurred as, or soon after, a suspect was arrested.").

In this case, the initial search of Defendant's cell phone took place approximately eighteen days after Defendant's arrest. The government cites no extenuating circumstances or other facts that rendered this delay unavoidable or necessary. The government has thus not established that the initial search of Defendant's cell phone was "substantially contemporaneous" with Defendant's arrest. *Shipley*, 395 U.S. at 819 (internal quotation marks omitted). Because the court has concluded that the initial search of Defendant's cell phone was not a search incident to arrest, the court need not address whether a warrantless search of a cell phone incident to arrest is constitutionally permissible. As the court has previously noted, the law in this area is in conflict and in flux.[2]

---

[2] *Compare United States v. Wurie*, 728 F.3d 1, 13 (1st Cir. 2013) ("[T]he search-incident-to-arrest exception does not authorize the warrantless search of data on a cell phone seized from an arrestee's person"), *cert. granted*, 2013 WL 4402108 (U.S. Jan. 17, 2014), *and United States v. Mayo*, 2013 WL 5945802, at *13 (D. Vt. Nov. 6, 2013) ("[C]ell phones properly seized pursuant to the search-incident-to-arrest exception or the automobile exception cannot be searched without a warrant."), *with United States v. Flores-Lopez*, 670 F.3d 803, 810 (7th Cir. 2012) (upholding cell phone search for its phone number as incident to arrest, but questioning whether a more invasive search would be permissible), *and United States v. Murphy*, 552 F.3d 405, 411 (4th Cir. 2009) ("[O]fficers may retrieve text messages and other information from cell phones and pagers seized incident to an arrest."), *and Silvan W. v. Briggs*, 309 F. App'x 216, 225 (10th

### E.  Whether the Independent Source Doctrine Applies.

The government argues that even if the initial search of Defendant's cell phone was not incident to Defendant's arrest, the evidence derived from the initial search would have been obtained under the independent source doctrine because law enforcement could have and eventually did obtain a search warrant for Defendant's cell phone without using any evidence derived from the initial search.  Defendant counters that the independent source doctrine does not dissipate the taint of the initial search because law enforcement would have not obtained the search warrant in the absence of the initial search.

Under the independent source doctrine, admission of otherwise excludable evidence is permissible where law enforcement obtains a valid search warrant based on "sources [that are] wholly unconnected with the [unlawful search] and [were] known to the agents well before the initial [search]." *Segura v. United States*, 468 U.S. 796, 814 (1984); *see also Murray v. United States*, 487 U.S. 533, 542 (1988) (finding that the independent source doctrine permits "second-look" warrants when the "later, lawful seizure is genuinely independent of an earlier, tainted one").  To rely upon this exception to the exclusionary rule, the government must show that "(1) the warrant . . . [is] supported by probable cause derived from sources independent of the illegal [conduct]; and (2) the decision to seek the warrant [was] not . . . prompted by information gleaned from the illegal conduct." *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993).

In this case, the government obtained a search warrant supported by probable cause without using any evidence derived from the initial search of Defendant's cell phone.  There is also no evidence that the initial search prompted the government's decision to obtain a search warrant.  At the time of the search warrant, Defendant's own admissions established that he was distributing illegal drugs in Vermont which he had

---

Cir. 2009) ("[T]he permissible scope of a search incident to arrest includes the contents of a cell phone found on the arrestee's person."), *and United States v. Finley*, 477 F.3d 250, 260 (5th Cir. 2007) (upholding search of the defendant's cell phone incident to arrest), *and People v. Riley*, 2013 WL 475242, at *6 (Cal. Ct. App. Feb. 8, 2013) (upholding cell phone search incident to arrest), *cert. granted*, 2013 WL 3938997 (U.S. Jan. 17, 2014).

acquired from New York City. The sizable amount of currency and the rock of crack cocaine seized from the back bedroom where Defendant was found corroborated Defendant's statements. As a recognized tool of the illegal drug trade, Defendant's cell phone was a piece of evidence that the government would inevitably seek to search. The government's decision to seek a warrant for a more thorough search of the cell phone comports with the Second Circuit's holding in *Johnson*.

In *Johnson*, law enforcement agents seized audio tapes and listened to them six months later on the mistaken belief that they could do so without a warrant. *Id.* at 982. The defendant moved to suppress on the basis that, "although the initial seizure of the tapes was lawful, [the] agents had unlawfully 'searched' the tapes by listening to them six months later without a warrant." *Id.* The district court expressed reservations about the agents' warrantless review of the tapes, and the agents subsequently sought and received a search warrant. The Second Circuit upheld the second search of the tapes under the independent source doctrine:

> Clearly, the agents would have and could have applied for and been issued a warrant to listen to the tapes regardless of their prior review. As noted above, there was probable cause for the warrant to issue, and the agents had good reason to want to review the tapes. In fact, the only reason the agents failed to apply for a warrant prior to listening to the tapes was their mistaken belief that they were entitled to do so. Once the district court expressed reservations about the legality of the review of the tapes, the government realized that a warrant was necessary. Whether the agents made their mistake in good faith is not relevant to this inquiry. What is key is the fact that their error did not result in the government obtaining evidence it would not otherwise have obtained. The government would have acquired the evidence on the tapes without the agents' mistaken prior review of the tapes, since the warrant application was prompted not by the prior review but by the obvious relevance of the tapes and the district court's indication that a warrant was necessary.

*Id.* at 987; *see also United States v. Mulder*, 889 F.2d 239, 241 (9th Cir. 1989) (holding that independent source doctrine allowed admission of chemical tests conducted pursuant to a "second-look" warrant obtained after the defendant's first conviction had been reversed because those same tests had initially been conducted without a warrant).

As in *Johnson*, the government's search warrant application here was prompted not by the prior review of Defendant's cell phone, but instead by the obvious relevance of the cell phone to the conspiracy charge against Defendant and Defendant's argument in his motion to suppress that the initial search of the cell phone was unlawful. The instant case thus falls squarely within *Johnson*. Accordingly, the evidence derived from the government's second cell phone search pursuant to a search warrant supported by probable cause is not subject to the exclusionary rule because the "later, lawful [search] is genuinely independent of [the] earlier, tainted one." *Murray*, 487 U.S. at 542. Defendant's motion to suppress the cell phone evidence is therefore DENIED.

## CONCLUSION

For the foregoing reasons, the court hereby DENIES Defendant's Motion to Suppress Evidence Based on an Unlawful Search (Doc. 30) and Motion to Suppress Recently Produced Evidence that is the Fruit of an Unlawful Cellphone Search. (Doc. 32.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 29th day of April, 2014.

Christina Reiss, Chief Judge
United States District Court